Mr. Gauntlet. Good morning, Your Honor. David Gauntlet. For the record, the University of California, Irvine is on its way to the College Baseball World Series. We are very pleased about that. We didn't have a football team, so we had to do our best. I would wish them well, but they're playing my alma mater in the first round, so go ahead. We also have a little hockey game in Orange County going down. Go right ahead. Your Honor, I think this case looks fairly complicated if you read all of the insurer briefs, but what I present to you this morning is quite simple. All you really have to find is defamation coverage, and that establishes a defense as against Federal and as against St. Paul. Where is the defamation? Let's talk about that for a second. Do you agree with me that under California law, defamation, whether you call it disparagement or trade libel or whatever, requires false statements? No, I don't, Your Honor. It could be misleading. A misleading statement is sufficient, but I think the false statement allegation is satisfied here, so I'm happy to meet that standard. First, if you look at the actual factual allegations at paragraphs, and these are all at 59, 60, et cetera, through 58 of the transcript, at paragraphs 42, 43, 45, 44, and 50, there are express allegations such as at 43, the clear logic has knowledge of Altera's contractual relations and acts to induce a disruption or breach thereof by interfering with the licensing restrictions placed on the use of Altera's software. The question is how does it so act? That is not explicitly stated in the allegations of the Altera complaint, but if you look at the affirmative defenses and answer that are set forth at 3176 through 3182, it clarifies precisely how it did that. And what it states is that clear logic's business model responds to deficiencies in the FPGA to ASIC conversion industry segment. And it states in paragraph 71, clear logic determined to direct its initial product offerings to providing a second source alternative to particular Altera FPGA devices. Clear logic began offering LASIC alternatives, not copies, but alternatives to certain Altera Flex 8000 family of FPGA devices in approximately January of 1998. That's within Federal's policy period. And then the question is how does it so act? Kennedy. Maybe I didn't make myself clear. Point me to the allegations of the complaint of Altera where Altera says that clear Yeah, the false statement is that. What did clear logic do that was false? Clear logic said that it had faster and cheaper products. That was not an accurate statement, not only because, well, it was, it did have faster and more accurate statements, but it was a false statement because it was legally not empowered to make that statement, according to Altera, because its ability to sell those products, to market them, was premised on its violation of a license agreement. But that isn't false. That's false. You don't have the right to tell the truth. But that doesn't make a difference as to whether it's the truth or not. If clear logic was faster and cheaper, and Altera says clear logic was faster and cheaper and they were stealing our business because they were stealing our intellectual property, where's the falsity? That they were legally empowered to offer it. In other words, you can have a false statement of law as well as fact. And that's the distinction. If you look at all the J letters, and they're very important, they have no letters offering any case authority. So what you're saying is Altera's allegation that clear logic claimed that they had the right to use Altera's intellectual property was false. And to state in connection with that that they had a faster and cheaper good was false. And that's what caused them injury. And there are half a dozen cases where, in other words, what the carriers want to say is unless it's a technically false statement about goods doing certain things, that's all you get. That's all that is possible. But you can also have a statement that you're not in a legal position to make a statement. And there's half a dozen cases which have dealt with just purely misstatements of legal rights. One of them is the land decision. And the land decision basically talked about the fact that the patent owner goes to a customer of the alleged infringer and said, if you buy from the infringer, I'm going to sue you too. And so what the implicit inferred statement was is that the infringer did not have a right to sell. And why? Because he was a thief. He was a patent infringer. So the implication, the inference arose from the misstatement of one's legal rights. In the Seagate case, which was before this Court, unpublished, but after 07, the Court said that Seagate was claiming its technology performed the same functions and that that statement was a misappropriation because they didn't have the right to sell that product. So there was both a technical statement understood in an inferred way to be a misstatement of legal rights. In the Western Syndication case, also before this Court, where Judge Hawkins sat on the panel, post-207, the statement that the Apollo show would not be distributed for the 04 broadcast season was understood to count doubt upon the existence of the Apollo's property in intangible things. It called into question the trademark rights, the legal rights that they possessed. Your phrase is, there's an allegation that Clear Logic made a false statement by making a misstatement of its legal rights. Is that right? Correct. Which misstatement was injurious because it caused customers of Altera to purchase the product and the serviced product aspects of what was being offered by them. Another case that's also helpful in this respect is OSI Industries from the Indiana Court of Appeals in 2005. There, there was a statement about whether the Thermodyne oven, which was purportedly an exclusive secret technology, was owned by company A or B. And this question of legal rights to ownership created coverage for disparagement. In the Penfield Oil case, an 07 case, there were allegations that there were false statements that a company had FDA approval. That's a legal right, a legal position that they have. In other words, there's nothing about the false statement that requires that only it be about a technical capacity. If that technical capacity is one the party doesn't legally possess, there can be a false statement that's disparaging. And if you look carefully at paragraph 71 of the affirmative defense, again, you get clarity about what it is that we were allegedly telling customers that Altera was upset about. And we told, and we, our basic allegation was that we had an alternative method for creating these programmable logic devices in a way that was faster, quicker, and more efficient than Altera. And indeed, we targeted Altera as a place to look to get these bit streams, which is simply information that then we use, and we created an LSIC, which is actually a faster and quicker way to create a semiconductor chip. Because we had patents, we had technology that we procured, spent millions and millions of dollars on, to procure the ability to do this thing. Also, if you look at 3181 in the affirmative defenses, Altera's software click wrap license does not restrict use of programming files embodying customer-created designs. That's what our statements were to the public. They don't have that right. If you tell somebody that they're overreaching, that they're misstating their legal rights, inappropriately enforcing their legal rights, and making false statements about what those legal rights are, that defames them, and it disparages the products that emanate from those. So then you can look at paragraph 75 and 78 at page 3181, and paragraph 79 at 3182. In 75, we state, Altera's tortious interference allegations rest on an inaccurate and insupportable construction of that license. Hi, Altera, you're making, telling the public things that are inaccurate and insupportable. That's not something you like to hear in the marketplace when your competitor is telling you that. That's defamation. That's disparagement as for the products. The current, and this is as of November 1999, Altera program license does not purport to limit the licensee's rights to use the output of the software in any manner that the licensee sees fit. That's what our legal basis for our assertion was. Paragraph 79. You are inferring by that that when Altera makes the opposite claim, it is false. Correct. And we also have the express statement by our marketing executive of customers of Altera, such as Cisco, that in fact, Altera was accused of misstating its legal rights. So we expressly told Cisco, hey, they're misstating your legal rights, come by with us. We have an ability through our patents to do this particular conversion activity, and that's in the record as well. And that's at paragraph 54, 55, and 56 are consistent with that. And if you look at 810 paragraph 6, that's where you'll see that in the excerpts of record. So that's the conduct that we have. And the cases, if you look at those J cases and you look at their response to each of those J cases, they basically come back and say, ah, but it was technically true that these were faster and quicker, and they ignore the legal situation, the legal implication, and thus the true defamation. And if you read the Lamb case carefully, and if you look at what I said about it in my reply brief, if you don't find defamation and disparagement here, you're basically going to find that the inferences and the implications that Judge Krauske found sufficient in Lamb don't do the job here, and you'll have a higher bar than has already been found by the court of appeal is sufficient, and that all the cases that I cited, there's a plethora of authority, say can occur in the context of a legal purported misperception. So if there's defamation and if there's disparagement, first if there's defamation, that's the end of federal. Gone next. As to St. Paul, if there's defamation or disparagement, they still have some other arguments. And the other arguments are related to exclusions that did not, were not reached by the district judge because he didn't get there. One of their exclusions is the first publication exclusion. Well, the problem with that is that there's distinct products. There's distinct communications about those products. And if you look at paragraph 75, I mean 71, it's like it was made for a coverage hypothetical exam for a law school. It says in January of 1998, we did product one. It's a completely different product in January of 99. So we have completely different products in both years. There's no possible overlap. If you look at, again, the Lamb decision, very critical. Judge Krausky says exclusion has to apply in all possible worlds and that basically the distinction of the first publication exclusion is one that goes to indemnity than to bar and defense. Judge Posner, in a well-decided decision involving Taco Bell in the Seventh Circuit, said, hey, even if you had the same campaign, which is the Taco Bell campaign involving the barking chihuahua on television he was talking about, if you have a distinct episode of that campaign, in this instance a chihuahua with its head popped out of a little cardboard cutout, that distinct episode is not barred by the first publication because it's distinct in character. So with those cases, it's clear that doesn't apply. The intellectual property exclusion for St. Paul does not bar a defense because these claims that I'm talking about are the basis for the interference claim. Indeed, interference with prospective economic advantage and contract is not technically a tort. It's a remedy for underlying tortious conduct, as the Supreme Court of California has stated. And here, that underlying tortious conduct is defamation and disparagement. It don't have to articulate by label the cause of action to show that such coverage is a potentiality. And so that leaves the argument about notice as to St. Paul. And the Court did not grant a cross motion or any relief to St. Paul. It just found that it couldn't as a matter of law rule in our favor as against St. Paul unnoticed. I think the Court erred as a matter of law in that finding. We have MBO, which is the appointed agent for Clear Logic who receives timely notice, and they tender to Federal. The testimony of MBO is they did tender to St. Paul, which was the carrier on risk when the lawsuit was filed. That would be the one they normally always tender to. Sometimes with occurrence coverage, they forget to tender to the earlier one. And the testimony by MBO's representative is that his assistant, Charmaine, sent it out, would have always sent it out in normal course. But we don't have that evidence. All we have is oral testimony, which is not contradicted. But we have no written evidence. So where are we? Well, we have ostensible authority. Why? Because on the policy, it nowhere mentions anyone but MBO. It doesn't mention St. Paul's address. And in the actual notice language of the policy, it says notice to the broker is notice to us, that that's sufficient. So when they receive notice, there may be an argument St. Paul has with MBO as between them, between to the terms of their agency agreement, as between whether that authority was exceeded. But as to ostensible authority in favor of finding coverage, that suffices. And a decision of this Court, the Killer Music decision from the Ninth Circuit, finds on even weaker facts than we have that we're an agent who is held out under the policy's terms as the person to give notice to receives notice. That is sufficient to charge the principal. And if you look at the basis for that decision in Killer Music, which is at 998-F-674-679, it's the various statutory provisions of the California Civil Code, there 2332, which stated that notice to an agent is equivalent to notice to the principal. It is clear that the ---- But was this an agent or was it a broker? Well, it was in the context of the notice. It was acted as the broker who was also an agent. In California insurance, the broker is quite different from an agent employed by the company and quite different from a general agent. Right. And in this context, it was a broker, which in this situation was functioning as an agent, as was the case in the Zurich decision. And it doesn't matter if you were a broker. You can still put yourself in a position of having ostensible authority where on the representative is notice to us. That broker was the authorized representative. Why? Because it said so in the policy. Our authorized representative is MBO. In other words, if there are distinctions that are as between the insurer and the broker that are not known to the insured, that doesn't vitiate the insured's rights to get notice. If you look at the Cohen case from New York Federal Court, which I cite in my J letters, it says an insured who deals with a putative agent has no duty to determine the scope of the agent's authority. You cannot but read the notice provision in the contract and find other than we are dealing with a putative agent. Do you want to save any time for rebuttal? Please. You have about two minutes. Counsel? Good morning. This is the Court's Steve Newton for Defendant for Respondent Federal Insurance Company. Are you going to split your time with the St. Paul? Yes, Your Honor. And in fact, because I have fewer issues to address, I'm not going to use the full 10 minutes. I'm going to give part of that over to them so that they can have more opportunity. But I'd like to start off the discussion this morning about the fact that this underlying case was a case about poaching. Altera said you poached through your conduct, ClearLogic, you poached our technology that we spent a lot of time, effort, and money to develop. And so you were able to develop your own product, which would then take our product and use it. And then, in addition to poaching our technology, because you have to have our Bitstream output, you then poached further by attempting to poach our customers who had our product by saying you may take our product and you may then add to it, but only because you have the Bitstream output, the ClearLogic product, which would then make the ClearLogic product and only then cheaper and faster, which, of course, are the magic words in the chip world. But for that conduct, I don't think we would have had a case by Altera versus ClearLogic. That was the essence of the case. And so what you have done is you've taken our technology and you have twisted away our potential customers. There is, when we do a reading of the complaints, we always try to do a fair reading to determine what the thrust of the action is all about. But we know that there are times when there are allegations in the complaints that are more than just a fair reading. You might run across a squiggle here or there that might trigger something, such as a duty to defend. But this complaint simply doesn't go there. When we take a look at the allegations in this complaint, paragraph 26 of the Altera complaint says that the ClearLogic product is cheaper and easier to use because all of the real engineering work has already been done by the customer and Altera. And this is not referring to a publication of a false statement by ClearLogic. This is referring to the conduct of ClearLogic. In the underlying action, did Altera dispute any of these claims? Altera, in the sense of, no, Altera is faster, cheaper, that sort of thing. They agreed with it. And they said essentially what you've done, you've really hurt us because what you've said is correct. It's accurate. It's fully accurate in the sense that it will make their product faster and cheaper. Therefore, we're going to lose customers, which is the whole reason why they sued, I believe, in the first place. But you can see that what they're alleging is a piggyback by the conduct of ClearLogic on the Altera work effort. And then paragraph 36 of the Altera complaint states that those products are substantially similar. And, in fact, it quoted from one of the ClearLogic press releases stating that, quote, device families have identical functionality. So there was no question but that they were intending to take away their product again, their market, by virtue of their conduct. What's the status of the underlying action? The underlying action, Your Honor, has been fully resolved in the sense that it was tried. ClearLogic was found to have infringed, and the verdict was upheld on appeal. So that action is over. Has the award been satisfied? Your Honor, I believe that ClearLogic is and was in a Chapter 11 bankruptcy, so I don't know the answer to that question. I would also refer the Court to Hometics v. Valley Forge Insurance Company, a decision we cited at page 16 of our brief, talking about the fact that when you emulate your competitor's product and maybe discuss that product, you certainly are not disparaging that product or defaming the company that prepared and gave birth to that product. What you're doing is you're flattering them because of the fact that you've decided to copy what they do. So with respect to Federal, it's not enough to say that there was trade libel or disparagement. That is not the issue as to Federal. The issue as to Federal is, is there defamation? And that's the sole issue on appeal here with respect to Federal, whether or not ClearLogic made a false statement that was published that was defamatory under California law. What's your response to the argument that, well, it's defamatory because of the misrepresentation of law? Right? Isn't that what it comes down to? Yes, Your Honor. And I've heard that repeated yet again here today, that ClearLogic would have said to a customer, Altura should not have the right to prevent you. It should not have the right. Did not have the right. It does not have the right. Excuse me, Your Honor. I misspoke. Did not have the right to stop people from using the Bitstream because it would be a breach of the license agreement. And that is simply a statement of the opinion of the company that owned the technology. And that is not actionable under California law as a, in fact ---- You mean because it's opinion? Yes, absolutely opinion. In fact, we've cited some cases in our brief to that effect, Your Honor. But, yes, it is an opinion. It would be no different than an attorney rendering an opinion that to a client that use of a technology does not infringe someone else's rights. It's an opinion. But it certainly is not something that impugns the honesty or integrity of a company. And, Your Honor, I've gone past where I think I was going to go. So unless there's other questions, I'd like to defer. I don't see any. Thank you. We'll hear from St. Paul at this time. Mr. Macon. Thank you, Your Honor. Good morning. I'm John Macon. I'm here with my partner, Nelson Shea, with Green Pepper Cellular in Lally on behalf of St. Paul Fire and Marine Insurance Company. I think to answer your question, Your Honor, Mr. Gauntlet's established why there is no coverage in this case. When you asked him where in the complaint are the allegations, Mr. Gauntlet spent minutes explaining to you where in his affirmative defenses, in the answer to the complaint, there were these allegations that he would like to have inferred from the Alterra complaint. Well, aren't those facts made known to the carrier before the decision of no coverage is made? No, Your Honor. That's exactly the point. The evidence is the only thing ever tendered to either Federal or St. Paul, and we argue that it was never tendered to St. Paul, and I'll get to that in a minute, was the complaint in the complaint alone. As the record demonstrates, Federal asked for additional information and received nothing. The only basis for making a coverage determination in this case in December of 1999, even if you assume, which St. Paul did for purposes of its motion, that there was notice to the carriers, was the complaint in the complaint alone. The Alterra complaint alleges nothing about representations concerning Alterra's licensing agreement. It says nothing about a war of allegations of what the legal interpretation of the licensing agreement meant. It alleged that clear logic was ripping off Alterra's intellectual property. That's what the complaint alleged. The very fact that Mr. Gondel has to resort to the answer in affirmative defenses is probably a better position than he had before, which was that somehow these allegations of defamation and disparagement emanated from the allegations of Alterra's penumbra. Adumbrate, I think, is a term that was used in a case back in Massachusetts once upon a time that was also rejected. Alterra alleged a specific willful, intentional stealing of their technology, both the masks for their chips and the output from their software. This was Alterra's intellectual property, which Alterra conceded gave clear logic about the ability to produce chips faster for customers and produce them cheaper, as they alleged, because all the engineering work had already been done by Alterra. There was nothing left to do. All they had to do was make the copies. There was no allegation of any war of words, any impugning of Alterra's integrity or anything else in the complaint. That just isn't there. When the insurers would have received this complaint in December of 1999, there was nothing about defamation, disparagement. This was a clear and simple case of technology ripoff. That's what this case was about. Mr. Gauntlet has referred to the Lamb case, and I commend the Lamb case to the Court. What Lamb found was that there were specific allegations of false statement of infringement. In this case, they never alleged anything false. It was said by clear logic. As a matter of fact, I believe Mr. Gauntlet has misspoke when he said that in California disparagement will allow be it allowed on a misleading statement. I do not think that is the state of the law. I think the cases that we've cited in our brief have made it very clear that California says to prove disparagement, you need an injurious falsehood. You need a false fact. And in response to your question, Your Honor, there would be no false facts in this case because essentially the only, quote, false assertion or misleading assertion even, if you will, is a legal interpretation of Alterra's licensing agreement. Under the Rodriguez case, an interpretation is not a false statement that will support defamation or disparagement unless and until a court has made an adjudication as to what that legal interpretation is. In other words, in this case, if after Judge Ware had said the Alterra licensing agreement prohibits clear logic or anyone else from using this bitstream, and then clear logic had gone out and said, oh, no, it's okay, you can give us the bitstream, that might have been a false statement of fact. But until that issue was resolved, this was a legal interpretation. It was a legal opinion. Generally, legal opinions are not the basis for disparagement or defamation in California. There is an exception for opinions where they imply a false fact or they imply undisclosed false facts. In this case, the only possible argument that could be made is to the Alterra customers. The only ones who would care about this would be Alterra customers who actually had the licensing agreement before them. They would have been in a position to see what the licensing agreement said and then what clear logic was saying was true or not. Under the decision in Franklin v. Dynamic Development Tools, the Court says that when you have the facts available to you and someone is telling you what they think those facts mean, that's an opinion and it's not actionable. That's exactly what happened here. Just as in the Franklin case where the defendant allegedly told people, look at this website, we think this shows what we think it means, that's exactly what happened in this case. Even if you accept that somehow these allegations of clear logics, assertions of rights under the licensing agreement could be found on the complaint, which they cannot, the fact remains that the only people who would have heard or could have understood those facts in any way would be people who had the licensing agreement in their hand and could look at it and say, well, I don't know, clear logic, maybe they're right, maybe they're wrong, but it's clearly an opinion. It's not a statement of fact. It's their interpretation of a legal right under the licensing agreement. With respect to the arguments made about whether or not there was material previously first made known, the complaint establishes without a doubt that both of the products that were at issue in this case, the 8000 series for clear logic and the 7000 series, the bit stream information, the use of masks had already been initiated prior to St. Paul's policy going into effect in the first January 1999. If the court looks at Exhibit 14 to the complaint, which can be found at Excerpt of Record 02736, this is a clear logic press release that was released in 1998, and it states that they were going to move on from the 8000 series to the 7000 series. Give me the slide again. Yes. ER20, excuse me, 02736. In November of 1998, clear logic was advising the public that it was going to do the same thing for the 7000 series that it had already done for the 8000 series. It once again, in that same press release, asked, solicited, if you will, for people to send their bit streams for the 7000 series. In other words, the oh, yeah, it's okay to send the bit streams to us argument, statement, assertion, which appears nowhere in the complaint, had already been made. So under the law of California, under the Ringler decision, you don't even really need to worry about whether they were substantially the same as the 8000 series. The fact is that clear logic made those representations. It was making that assertion, whatever it is, that appears nowhere in the complaint, prior to 1999, which was a retroactive date for St. Paul, at which point there is no coverage under the material first previously made known prior to the policy period under the CGL that St. Paul issued. The other issue that hasn't been touched on, and I'm assuming that Mr. Gauntle is saving it for his rebuttal, is St. Paul's E&O policy. It's an errors and omissions policy. It requires coverage or allows you to talk about whether you received notice or not. Well, I will address that right now, Your Honor. The answer is no, we did not receive notice. That's our position. What the Court found below is that it was a question of fact. We didn't even argue that that could be resolved on summary judgment, and we don't think that it can. The fact remains that there are – there's evidence on both sides. Contrary to Mr. Gauntle's assertion, Mr. Jordan did not testify that notice was given. What he testified is that he assumed that his assistant would have done that. That he assumed that. He doesn't know that. He assumed that. So for all practical purposes, we should assume for this motion, I mean for this appeal, that you did get a tender defense demand. For purposes of St. Paul's motion, we said that we would assume that. For purposes of ClearLogic's motion, we do oppose that. There were cross motions, Your Honor, and that's what makes the bulk of this record, for one thing. With respect to – for deciding St. Paul's motions, it can be assumed that even if we had received notice, there would have been no coverage. With respect to St. Paul's opposition to ClearLogic's motion, we do contest notice. We contest tender. The facts are in conflict. Under California law, whether someone is a broker or agent when they're operating in a dual capacity is a question of fact. And in this case, the letter that was sent was sent to MBO and said, please tender this to the appropriate carriers. That's not, please, you know, it's not like we hear by tender notice. It says, please tender this notice. A reasonable inference is that they were asking their broker, MBO, to act on their behalf. As we also cited in opposition, there was a communication between Federal and ClearLogic, and ClearLogic says, well, I don't know about coverage. Talk to our agent, MBO. And Federal, in fact, discussed the issue with MBO on behalf of ClearLogic. With respect to St. Paul, there is indeed an agency agreement. They are allowed to transact business. That is, sell insurance. However, they're not allowed to handle claims unless they have some other specified authority, and there is nothing in the record that establishes that they were ever – MBO was ever granted any authority with respect to claims. What about the ostensible authority argument? Well, the ostensible authority argument requires that there be evidence that there was actual reliance, and there is none. The evidence in the record was that when ClearLogic was deposed in this matter, the person they put up said that he had never heard of MBO, that he had never heard of St. Paul, that he didn't know anything about it, and part of that was because he didn't come to ClearLogic until years after this 1999 letter. There's simply no evidence in the record that, in fact, ClearLogic was relying on its understanding that MBO was St. Paul for purposes of making a claim. In addition, if you peruse the records, you will find that these assertions that MBO was the authorized representative, those kinds of indications on the face of the policy don't occur until 2000 and 2001. They're not on the policy that was issued in 1999 or would have covered the 1999 claim. And the bottom line in this case is that even if you could get past all the problems that they have with no allegations in the complaint and the fact that even if the allegation they want to make is essentially a legal opinion that's not actionable, at the end of the day, this was an intellectual property case. This was Altera alleging that their chips, their masks had been ripped off, and they were alleging that their software, their intellectual property, the output from their software licensing agreements, was being hijacked. That would make the intellectual property exclusion in both the St. Paul CGL and the St. Paul E&O policies applicable. The policy says that it does not cover losses from an actual or alleged infringement or violation of intellectual property rights. It's not just infringement. It's not just copying. It's not just trademarks. It's any intellectual property rights. And in this case, there was clearly nothing but intellectual property rights. All you have to do is read the opinion in Altera v. Clerologic, the Ninth Circuit, issued at 424 F3rd 1079, and you will see that this case is all about intellectual property rights and the fact that Clerologic made a business decision in 1996 that they thought by their legal interpretation they could get away with it. They were wrong. That's not an error. That's not a mistake. That's a bad decision. Thank you, Your Honor. All right. We'll hear a rebuttal at this time. Yes, you do. Thank you, Your Honor. You have almost two minutes. Thank you, Your Honor. I urge the Court to look very carefully at the statements by St. Paul because there's been some very distinct misstatements of fact in the law that are quite troubling. I'll just read you from the land decision of Judge Kroski. The term disparagement has been held to include statements about a competitor's meeting and are made to influence potential purchasers not to buy. This notion about opinion was not raised by St. Paul. Federal raised it. But if something is capable of being shown to be either true or untrue, it's not an opinion. It's a fact. And that's true of all those cases that I cited and all those J letters. The assertion that one is an FDA-approved entity is either true or untrue. If it's untrue, if it's used to compete unfairly, that can create disparagement exposure. And it's absolutely untrue that the standard in California is merely facts known to the insurer. It's facts available to the insurer. And that includes an answer that was provided, that was in the public record, which was filed on two weeks before the denial letter of Federal in January. It also is the case that we retendered the entire matter in 03 before the underlying action was resolved in 05, and that included all the motions, all the supporting documentations, and all the evidence, including the evidence of the marketing director of ClearLogic that said use of the Bistring was not restricted and Altura's claims to the contrary were false and inaccurate. I urge the Court to look at the affirmative defenses because they put meat and clarify what is in the Altura pleadings, especially paragraph 79. This case was both interference and mask act infringement. And the interference counts are based on fact allegations that create potential exposure for defamation or disparagement. They have talked about situations on particular paragraphs that in and of themselves may not be sufficient to show a defense. They haven't gone the other direction. 44, 42, 43, 45, and 50, if you carefully review them in concert with the reply brief, you'll see why there's clearly a defense due. And if you don't find a defense, LAM doesn't make any sense because there was much less inferential activity required here than there was at LAM to get to the result Judge Krauske carefully reached there. Okay. Thank you both for the arguments. Very interesting case. It will be submitted for decision. Court will stand in recess for the day.
judges: Hawkins, Tashima, Bea